All rise. The State of Illinois Veterans Commission Division of the North Forest and Outback and Honorable Justice Lee B. Goldrich is residing. Please be seated. Thank you. The clerk will discall the first base in the afternoon. 116-2747, Kevin Allister v. Northcock. Counsel, you may proceed. May it please the clerk? Counsel? My name is Carolina Zielinska. I represent the plaintiff appellant, Kevin McAllister. Your Honor, this is a case that can be limited to the discussion regarding whether the plaintiff's injury arose out of his employment. And the only issue before the court here today is whether Mr. McAllister's act of kneeling in the walk-in cooler while looking for a food product was an act that was distinctly associated with his employment. In other words, was the risk of injury here peculiar to his work? Did you rely on Young? Did you argue Young? Yes, Judge. I'm curious because, at least in my mind, I think Young is distinguishable from the situation. We relied on Young as well as Mitnick and our appellant. Well, what would you take away from Young? Why do you think Young controls the situation? Sure. So, particularly Young, what this Court held was that the plaintiff's injury there, he was a parts inspector. He was reaching his arm into a deep, narrow box to retrieve a part. And the Court indicated that even though that act of reaching is an act that a general public does on a regular basis, the evidence there showed that he was exposed to a greater risk because the act of reaching was something that was distinctly associated with his employment. Because he was doing it on a continuing, repeated basis. But we didn't go into a neutral risk. It wasn't decided on a neutral risk. Right. Because he didn't need to. Because he was doing it as a peculiar risk. His job required him to reach in his barrel continuously and repeatedly. Okay? No. That was not my understanding, Your Honor. It was not a neutral risk analysis. It was something unique about the barrel. Correct. It was the uniqueness of the job that, in this particular instance, in order to retrieve the part, this is what he had to do. He had to reach in there. I guess we could argue he could have dumped the items out of the box. He could have gotten the items out of the box in various ways in order to inspect them. So why would reaching, looking under a cooler for missing vegetables be part of his job requirements? Sure. So just as in that case, he had to inspect the parts. My client had to prepare and cook dinner. That was the entirety of his job as a sous chef. He wasn't the main chef. He was the chef's secondhand man. So his job is to prepare the meals, ask and testify, to arrange the walk-in cooler. He was in his walk-in cooler multiple times per day in order to retrieve food, to prepare it, and to cook it. But was he kneeling? He was injured in the act of kneeling, correct? Correct. He was injured while looking for a food product. That was on the floor, by the way. Yeah. These carrots were on the floor. It's nice if you went to that restaurant that you know that he's looking for carrots that fall on the floor under a shelf. Put aside. Put aside for a moment. I mean, that's a little shocking. It's supposed to be an upscale restaurant. But that's not a problem. It is a nice restaurant. Yeah, but don't eat carrots. The problem was that he was looking for this food product because a shelf of his, excuse me, of Cocoa Bits that's underneath him couldn't find them. So he said, I will go look. He looked in the cooler. He indicated he had looked in the top shelf, middle shelf, lower shelf. And thus, they did a trial. At times, items did get knocked underneath the cooler. Onto the floor. Onto the floor. I realize you're in a difficult position. You probably don't want to acknowledge that these vegetables are always falling on the floor in the restaurant. But I guess the point that I'm trying to get to is, now, if he, you know, cut a finger or something, chopping something, I could see that. But the act of kneeling, is this something that he was required to do, looking for vegetables under tables? You know, does that happen all the time or is it just, you know, this particular occasion? My understanding is it's his responsibility to run this kitchen. So as many times as items may have fallen under this cooler, he indicated it was sometimes. He didn't specify how many times. In order to retrieve them, you do have to kneel in order to go underneath. But that could be once in a week, the act of kneeling. How would you distinguish this from the case in which the gentleman who was required to do paperwork dropped a pen on the floor and got injured picking it up? He had to pick up his pen, right? Sure. This gentleman's job, in my opinion, Judge, is not related to picking up pens. His job is to fill out sheets. He was filling out truck sheets, I believe. You're referring to the case of Newton, was it? Right. In that situation, his job is to prepare these truck sheets. Maybe had he been lifting an entire box full of truck sheets in order to start preparing them, I would say that that lifting injury would have been related. He doesn't need to drop a pen. It was a personal item he dropped on the ground and then he tried to reach. In this case, my client wasn't volunteering at the time of this injury. He wasn't tying his shoe. When you say a personal item, are you focusing on whether the pen was provided by the employer or an employee? Not so much. It was just something that was a small task at that time that he had dropped. He may have never dropped a pen ever in his life. Isn't it foreseeable, though, that a man who's filling out forms would drop a pen and be expected and foreseeable to pick up the pen to complete the form filling? I guess you could say it's foreseeable, but I wouldn't say that it's incidental to his duties. Where in our case, it is incidental. This individual has said it happens often. I mean, he has to do this. He has to find this. It doesn't have to be more than incidental, not the first words. In Young, and I'm looking at what this Court decided, reaching and stretching his arm into a deep, narrow box to retrieve parts for inspection was distinctly associated with his employment, the act of reaching into a box. Correct. So are you telling us that the sous chef looking occasionally underneath the table for missing vegetables is an act that's distinctly, the act of kneeling to look under a table, is distinctly associated with being a sous chef? That's exactly what I'm saying, Your Honor. And why is that? Because he needs to prepare this food whatever way that he must do this. If they're not losing vegetables, then he's not a sous chef. Kneeling is something we all do on occasion. It's not associated with any particular job. How is it associated with any particular job, unless it's his job to kneel and look under the shelves? The totality of his job is not to kneel, and I won't say that, and that's not in the record at all. What he indicated was that in this particular instance, that's what he was doing because the food item was there. Had it happened in the past, yes. Does he have to kneel on a daily basis? That's not in the record. But again, in my understanding, that's going into mutual risk analysis, which is not what we're arguing. What we're arguing is that that act itself, in order to locate this food, in order to prepare this food, he had to kneel in this cooler. It's the way the cooler was designed. Had the cooler been designed where, for example, the fan starts here and the shelving starts here, all he has to do is look straight. That's one thing, but it's not designed that way. It's designed where there's shelving all the way to the bottom, and he said he looked at every single shelf, couldn't find it, needed to kneel to look underneath. So it doesn't matter how frequently he's doing it or whether it's distinctly associated. Basically, your arguing is, you know, occasionally in the course of being the sous chef, he would occasionally, whether it's once a week, once a month, have to look for vegetables under the shelf and so it should be compensated on that basis. Yes, Judge. And if I can add to that, this Court also held in Mitnick, which I believe was filed in November of 2016. My understanding of the facts in that case and the ruling of this Court is the following. This individual's job indicated that he loaded bolts into an arm and he had to raise the arm and sometimes the bolts would fall off. But he was doing that, again, on a continuing, ongoing basis. This is what he did all day long. He was loading the arm all day long, correct? Right. He didn't indicate that all day long these bolts would be dropping and every single day he'd be running out there bending to pick them up. That was not the testimony. I understand that. But that's a natural result of having to load the bolts up. If they're falling, he's going to have to get them. The act that created the incident was something he did continuously and repeatedly. And what I would say about that is the natural act of a restaurant and the way it functions is that it's busy. Kitchens are busy. Items do fall. That's exactly what he says. Items fall. So in Mitnick, what was the activity? His job duty was to do what? So what ended up happening in Mitnick was some of the witness testimony was that at times these bolts would fall off of these arms and the entire sort of fabrication process or assembly line would stop if the claimant didn't run into the area of fabrication, pick up and over, pick up the bolt, and bring it back. Because if it remained there, it would stall the assembly line. So in that case, this court found that. Very similar to Newman. Well, it was very similar. The difference between Mitnick and Newman is that in Newman, it was the claimant that dropped the pencil. In Mitnick, the machine as part of the automated process would occasionally, once an hour, not complete it correctly and the mechanism would drop the bolt. And it was incumbent on the claimant in Mitnick to reach down and grab the bolt before it stopped the assembly line. That's exactly right. So it's an affirmative act in Newman of dropping the pen, which isn't necessarily something that the employer would contemplate versus Mitnick, where the bolt would be dropped by the machine and it was anticipated by the employer that the claimant would pick up the bolt. Right. What the claimant indicated was not that it was my task, it was in my list of duties that I have to run in there and pick this up, but he indicated if the assembly line stalled, we would be subject to discipline. Well, it was his station. Correct. No one else was responsible for that area but the claimant, didn't they know? And the assembly line needed to run. That's what he indicated. So in that case, this guy, the sous chef, he's looking for this pan and carrot. It was someone else's responsibility. It was his cook that mentioned to him I couldn't find him. So he said, I will help you find him. Was it in order to complete the sous chef's task that the sous chef went to find him, or was he doing it as a favor? Well, no, it was the totality of the kitchen. At the time this was occurring, the chef was in the office. There's some office space nearby. The chef was not in the kitchen. It was just Mr. McAllister, the sous chef, that was in the kitchen. So what we're saying is that his overall general duty is to prepare this food, and in order to do that, he had to locate it. So if it's a cook whose underground says, I can't find this, and he indicated in the record I had some extra time, I went to help to locate for prepping and for service. So his overall duty when the chef is absent from the kitchen, who's in charge? He would be in charge. And his overall duty is to make sure that food is being prepared, right? Correct. And your argument is, as part of that will entail the task of finding the food. Correct. He has to arrange the cooler. And part of that is these items get knocked underneath it, so he has to kneel in order to pick them up. Now, in this case, of course, he didn't locate the carrots. They weren't there. And so it was a story. But had he located them, would that change the facts? I don't think so. I think his job was still to find it, and that's what he was doing. So if you're a manager of a plant and occasionally you're called upon to help somebody, then no matter what you do, you'd be compensated if you're injured, because your overall responsibility, like the chef, is to help out in the plant. Sure. If there's a vending activity that is specific to another individual and you, as that plant manager, come over to assist and you're injured in the act of doing that, absolutely. But that's a different thing. No matter what your act is, because you're assisting somebody else. I think it's associated with that job. I mean, if the act is – It's not associated with the plant manager's job. He's helping somebody out in a one-time thing. In order to run whatever industry this may be. So what is the test, then, of compensability here? Tell us succinctly why the chef recovers here, because he did what? Because he was engaged in an employment-related risk. That is the analysis that – Whether it's distinctly associated with his personal job or not. This is an overall employment-related risk. Well, employment-related risk and distinctly associated risk, in my understanding, are the same thing. I think this Court has defined it in three ways. Acts that he was instructed to perform. Acts which he had a common law or statutory duty to perform. And then the final one, which we've been discussing today, is acts which the employee might reasonably be expected to perform incident to his assigned duties, which is where we think this falls. So you find that – I mean, I remember, because I've authored a majority of decisions in Young, Midnick, Steak and Shake, and Noonan, that caterpillar language is really the basis for the decision in all four of those opinions. It then becomes hard, though, to distinguish between, let's say, the Noonan case, where you've got the fellow that drops the pen. As Justice Aldrich said, isn't it reasonably expected on the part of the employer that the employee would bend over to pick up the pen? I mean, there has to be a line drawn somewhere to distinguish between cases that are compensable versus non-compensable there. In Noonan, we found it non-compensable. In Midnick, with the dropped bolt, we found it to be compensable. Now, I'll just throw out there, I'm not saying this is right or wrong, or the rational basis for finding that dividing line, but in Midnick, it was the machine that dropped the bolt and the employee was expected to pick up that bolt. In Noonan, the employee dropped the pen, and that wasn't part of his job, and he picked it up. Is that a rational basis for deciding compensability versus non-compensability? Well, I think you certainly have to draw a line somewhere. I agree that you do. I don't think this case is where you have to draw the line. I think this case is comparable to Affleck and Midnick. Even though it wasn't Mr. McAllister who stated, I dropped them and I had to pick them up or vice versa, he did indicate that this happened more often than one time, which is what the Commission sort of kept stating in their decision, that it was an isolated event. In Midnick, it was indicated that this happened, I believe the word was oftentimes, and in our case, he did indicate it was sometimes. In Affleck, we didn't get into that discussion at all. No one asked how many times this claimant had to reach for soap. She said she did it because she was thinking about the safety of the resident at that time, and that was, to me, in my understanding, a single occasion. Her job was to bathe the resident, et cetera. On a single occasion, she saw some soaps as accumulating and reached. Which case are you talking about? This is Autumn Accolade. Accolade. Accolade, excuse me. Yeah, no, it's Accolade, Autumn Accolade. Autumn Accolade. It was a 2013, May of 2013. So this was the caregiver case where she was reaching. And from this Court's opinion and the decisions that I read, it wasn't a matter of how many times did she have to perform this reaching activity. It was a matter of safety. But it was distinctly associated with her particular job. And maybe the more I think about it and listen to you, it's going to turn on, you're talking about, and you're saying this is an employment risk. I don't think that alone. You may have to convince us that his bending over or bending down looking for things was really something pretty distinctly associated with his personal job duties. And you're trying to sell it on the job that he's got some overarching responsibility for the kitchen, although it is not necessarily his job every day to look under shelving units, correct? I think it's his job every day to locate the food in whatever manner that may be, which is why it's difficult for me to stand here and argue and tell you exactly how many times this happens because truthfully, we hope it doesn't happen that often. We don't want. That's what I mean. Maybe in my naivety, I'm assuming that a chef isn't looking for missing vegetables every hour. I would hope so. Let's hope that isn't the case. But my understanding is that this did happen more often than not. Well, doesn't the record suggest that it's really the cook that goes in there to actually procure the vegetables, go back and cook them? No, your chef. The cook in this case said that he was looking for them. Our chef did indicate that it was part of his task to arrange the walk-in cooler. To arrange it, to arrange it. Correct. But not procure. There's a difference. Yeah. Maybe he didn't specify procuring as well. But arranging walk-in cooler in terms of a kitchen means putting food in and taking food out or shuffling food around. I don't know that. We're all speculating that. Arrange means you go into some place and you move it. But it doesn't mean that you go and retrieve it and take it out. Wouldn't that be one way of drawing a distinction between what we've talked about already, between a non-compensable risk such as in Noonan versus a compensable risk as in Midnick? It would be to actually say what would the employee's job classification be defined as or his job duties be defined as? If he was to write out what his job consists of. Here would the sous chef say in his job description that he was to look for food under, you know, in shelves or would it be something different? And if the job description of the sous chef then would encompass whatever act that led to his injury, then that would be a compensable injury. If it happened that he was injured doing something that wouldn't be encompassed within that job description, then it's non-compensable. Would that be a rational way of defining the employment risk here? I believe it is. It would be. I mean, it's definitely a rational way of thinking about it, but in this case, Would it be in conformance with the case law? Yes, but not every job will have a specific list of duties and that's sort of why we're here. I think as often as we are, it's because it doesn't indicate in my job I have to kneel down and look for items under the cooler. It's just that it happens. You know, you make a legitimate point. Then how do you interpret the phrase, though, distinctly as associated with the job? It doesn't have to be more than, well, occasionally I might do anything there. So this is where I drew from this court's definition of that. Well, you don't even have to go to this court's definition. Don't you ultimately go back to Caterpillar, the Supreme Court's definition, which includes acts which the employee might reasonably be expected to perform incident to his assigned duties. Absolutely. Doesn't that then put it in the category of the job description, then? Yes, yes. And if you don't have a job description, you have to verbalize that description at trial, and that's what he intended to do by stating, I arrange the cooler, I prepare meals, the chef isn't in the kitchen, and oftentimes items would get knocked underneath there, so I had to kneel down and grab it. Well, what happened in the case where the guy drops the pen? Wouldn't an employer reasonably expect an administrator to pick up a pen that he drops that he needs to use? Could an employer expect that would happen? Yes. Is that incidental to his job? I don't think you have to look at it in terms of is this something that happens regularly and is this necessary in order to complete that overall task? You're blending. You'll have time in reply. Thank you. I'd like to go over. Counsel, you may respond. Your Honor, may it please the Court? My name is Jason Kolecki. I'm here on behalf of North Pond. Something that counsel seems to avoid in her argument I take from the Ad Hoc decision, which was run by this Court where it says the commission should not award benefits for injuries caused by everyday activities like walking, bending, or turning, even if the employee was ordered or instructed to perform these activities as part of their job. And that's what we're talking about here. Counsel wants you to take this broad definition that a sous chef does everything. So as long as he's doing something that's possibly related, then automatically it's permissible. Now, Justice Holdren, I went back and listened to your whole argument in this case, and you asked a very good hypothetical, and you said what happens when— Injuries are rare. I'm sorry? Rare. You said what happens when the person walks from Station A to Station B. And I would put that in the same situation. Under counsel's theory, if the sous chef was injured walking from the station to the cooler and tripped and fell for no reason, well, they were performing a duty. They had to get those carrots, so obviously that's compensable. It hasn't. The Supreme Court told us that injuries that occur while walking or climbing on steps are not compensable. Correct. So you've got to take walking and steps out of it. Okay. Well, this situation we have to remember, too, is the facts of the case don't say he was injured when he was kneeling down. He was injured when he was standing up. He had completed a task of looking for the carrots, couldn't find them, so he was actually injured from going from kneeling to a standing position on a one-time occasion. The record doesn't say he does it all the time. Actually, the description of the job says checking in orders was the first thing he testified to. I don't think you can check in orders if you're kneeling. It says arranging the walking cooler. Now, if you arrange the walking cooler properly, I don't think anything would fall on the floor, so you wouldn't have to kneel. So I'm not sure if you kneel while arranging the walking cooler. Making sauces, you wouldn't kneel for that. Prepping, I'm not sure what prepping consists of. Counsel had an opportunity to examine their client and testify to what that consists of, and that's all that was stated. So you would agree that what he was doing at the time, or you would say that what he was doing at the time wouldn't fall within his job description. Correct. So he wasn't doing something that was incidental to his employment. Correct. There's nothing incidental about going from a kneeling to a standing position to the job of a sous chef. We all do it in our jobs. If I drop a pen under my desk at the office, I have to pick it up, or if I have to plug in my computer once because I knocked off the cord, is that incidental to me being an attorney? I don't think it is. And in this situation, he simply went one time because that's the testimony. Now, it says sometimes things fell. It didn't say sometimes. He was the one that retrieved them. And as you point out, Justice Harris, he was retrieving them for a cook. A cook had misplaced them. He testified he had some time to find them. So he was doing somebody else's job. So the testimony and the evidence supports that this is a one-time occasion that was, beforehand, not distinctly associated with his job as a sous chef. Thank you. Thank you, Counsel. Counsel, you may reply. Just briefly, Your Honors, I do agree in terms of cases regarding walking, those are sort of subject to the case at hand. In terms of the turning and bending, it's not necessarily a flat rule, right-of-hand rule that bending cases don't fall into this. Obviously, bending case did fall into it in Mitnick. So we've sort of gone into the argument again where you have to look precisely as not only the act, but was it something that was an employment-related risk? What about just simply sitting in a chair for someone who has overall supervisory responsibility over an entire factory? He sits in a chair in his office, and he falls out of the chair. Is that compensable? Or is that positional risk? His entire job is to sit in a chair. No, his job is to supervise a factory. He has an office. There's a chair in the office. He misses the chair and falls on his butt. Is the action of falling out of the chair the performance of a task incidental to his employment? It doesn't seem like it. I mean, I would say it is not. I think in that particular case, what we would do is probably look at mutual risk and see if for some reason this gentleman is sitting and standing more often than other managers or supervisors. But in and of itself, just sitting in a chair, I think that's where a line would be drawn. What about the act of opening a door? In your example, there's a knock on the door. There's a delivery. There's no one there to answer the door. So the chef, who has overall responsibility obviously for the kitchen and restaurant, goes to the back and hurts his wrist opening the door. He recovers. Why? He's opening the door. If testimony in trial was deliveries came in often and I had to open the door. Well, you've already conceded that vegetables aren't falling every hour. No, it's once in three days he has to open the back door. Obviously, somebody in the kitchen has to open the door if there's a delivery. So under your argument, then, he would recover merely by opening a door if he's injured. No, I don't think that the act of opening the door once every three days or a week or whatnot is something that's related to his job. So is it the frequency of the act, then, that draws the line? I think it would be the testimony, going back to what Justice Harris was saying. If there's a detailed job description, it's much easier. If the job description indicates deliveries come in three times a day. If the job description says he'll not look for carrots under a shelf, you've got a point. Right. But if kneeling down is something that occurs very infrequently, don't you think that shifts it then to the neutral risk analysis as opposed to the employment-related risk analysis? In situations where you are sitting in a chair or opening a doorknob, I would say yes, because that is another act. Well, now remember, that's not walking or climbing chairs, which the Supreme Court has carved an exception for. That's something else. And so why is that different than occasionally slooping down to see if there's a carrot under the counter? Because the way that the walk-in cooler is arranged is at various levels, high to low, going towards the ground. And he's saying in order to check all those levels, that's what you need to do. So there's a cooler with some sort of surface underneath it. We don't know if it's a hard surface or a carpet or whatnot. But he has to get down on it in order to look for this. So it's different than a one-time delivery. Again, if the chef's job was indicated in some sort of either record or we had a job description and he said, I am in charge of deliveries, I would argue that just tells him that that may be something he should recover for. If he's in charge of deliveries and deliveries come through a specific door, he's reaching for that door day in and day out. Let's assume for the sake of your argument that he is absolutely in charge of arranging the cooler every single day. Yes. Was he hurt here in the process of arranging the cooler? Was he hurt when somebody said, hey, can you do me a favor and look under the shelf? He's not required to look under the shelf at any particular time, is he? But he is required to arrange the cooler. So your argument would be a lot stronger to me if he was hurt in the process of arranging the cooler, which is specifically an employment risk he's supposed to do. Now when somebody goes, hey, friend, can you look under the table for me? But wouldn't we say that's analogous to, again, the caregiver and accolade in the sense that her job also wasn't to reach for a particular soap dish in that specific instance? Yeah, but it's connected. She's helping somebody in the shower, okay? So reaching out for a soap dish is directly connected with that. But she indicated it was for safety concerns. It wasn't like she was grabbing the soap to complete any sort of bathing activity. So to me it was the overall sense of it was why did she do that task? Why did she reach for the safety of the resident? We're here. Why did he do that task? Well, again, I would agree with you. If his task was to arrange the cooler and in the process of arranging the cooler something fell into the cooler, he kneeled down then, I would agree with you because that's part and parcel of arranging the cooler, just like giving somebody a bath. It's part and parcel of using soap. Here's what's done exactly with him. Is there any question that the sous chef would have a compensable injury if he cut himself while chopping vegetables? No. That would be something that is contemplated by the job of being a sous chef, right? Yes. Although he did not testify he cuts food, he said he prepares it and cooks it. So an argument would be made that everybody cuts vegetables or cuts whatever as an activity of everyday life. Is that right? True. So we do have to look at what it is that the individual does, what their job is, right? Just as Justice Hudson asked about opening a door, if the sous chef had opened the door, if that same injury caused by opening a door resulted to a doorman, would that then be a different scenario where we'd be looking at the doorman's job description and that then is, under Caterpillar, even though an activity of everyday life, one that is incidental to the doorman's employment? Yes, I would agree. Yes, absolutely. Are there any other questions? I believe there are. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement and written disposition shall issue.